[Civ. No. 13858.   Second Dist., Div. Three.   Oct. 1, 1943.]

GEORGE H. DAVIS et al., Plaintiffs; HENRY MacISAAC, Appellant, v. INTERNATIONAL ALLIANCE OF THE-ATRICAL STAGE EMPLOYEES AND MOVING PIC-TURE MACHINE OPERATORS OF THE UNITED STATES AND CANADA et al., Respondents.

GEORGE H. DAVIS, Appellant, v. WILLIAM BIOFF et al., Defendants; INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOVING PICTURE MACHINE OPERATORS OF THE UNITED STATES AND CANADA et al., Respondents.

714

Thomas A. Joyner, Reginald L. Dyer and Theodore E. Bowen for Appellants.

Bodkin, Breslin & Luddy and Michael G. Luddy for Respondents.

BISHOP, J. pro tem.—The plaintiffs, George H. Davis and Henry MacIsaac, were, but no longer are, members of the defendant International Alliance of Theatrical Stage Employees and Motion Picture Operators of the United States and Canada, an unincorporated association. Plaintiffs are no longer members of the Alliance because they were expelled from that organization following trials upon charges that

they had joined an organization which was opposed to the best interests of the Alliance and by so doing had conducted themselves in a manner detrimental to the advancement of the purposes which the Alliance pursues. There is no doubt that the plaintiffs were guilty of promoting an organization which, had it been successful, would have defeated the purposes of the organization of which they were members and that their guilt was proven at their trials. They contend, however, that the trials were not held in conformity with the procedure prescribed by the constitution of the Alliance, and, of even more consequence, that the determination of the penalty which they should suffer was not left to the local organization of the Alliance, as it should have been, but was undertaken by one who had no authority. By these two cases, consolidated for trial, plaintiffs sought mandatory injunctions restoring them to membership, damages for their losses due to their loss of membership and declaratory relief. From the judgment denying them any relief, plaintiffs have appealed. We are of the opinion that the judgment should be affirmed.

A succinct statement of the general principles governing this case we find in *Smith* v. *Kern County Medical Assn.*, (1942) 19 Cal.2d 263, 265 [120 P.2d 874, 875]: "In any proper case involving the expulsion of a member from a voluntary unincorporated association, the only function which the courts may perform is to determine whether the association has acted within its powers in good faith, in accordance with its laws and the law of the land. [Citing cases.]"

No complaint is or with any seriousness could be made by the plaintiffs that due process was lacking in their expulsion, for formal charges were made and served upon each of them and they were given timely notice of the dates and places of their respective trials and, so far as appears, the trials were fairly conducted. Neither plaintiff took advantage of the opportunity afforded him to attend his trial and defend himself, but his absence does not affect the validity of the proceeding. (*Smith* v. *Kern County Medical Assn., supra,* 19 Cal.2d 263, 268, 269 [120 P.2d 874].) The evidence supports the conclusion that the charges were made and pressed in good faith. An organization has the natural right of self preservation, and may with propriety expel members who show their disloyalty by joining a rival organization. (*Neto* v. *Conselho Amor Da Sociedade,* (1912) 18 Cal.App. 234 [122 P. 973]; and see *Smith* v. *Kern County Medical Assn., supra,* 19 Cal.2d 263, 270 [120 P.2d 874].)

The real question in the case thus comes to this: Were the

plaintiffs tried and expelled in accordance with the constitution and by-laws of the Alliance. "The constitution and by-laws of a voluntary association are the measure of the authority conferred upon the organization to discipline, suspend or expel its members. The provisions of the constitution and by-laws become the contract between the organization and its members, limiting the power to regulate the conduct of its members." (*Smetherham* v. *Laundry Workers' Union*, (1941) 44 Cal.App.2d 131, 136, 137 [111 P.2d 948].)

The plaintiffs are able to point to several provisions of the Alliance's constitution which touch upon the subject of disciplinary trials, and with truth say that in the conduct of their trials the procedure there prescribed was not followed. Specifically plaintiffs note that section 6 of article XVI requires that the charges shall be filed with the secretary of the local union, whereas in fact they were filed with one Gatelee, who was an international representative. By the terms of section 8 of the same article the charges should have been, but were not, read at a regular meeting of the local union. The presiding officer, it is further provided, shall refer the charges to a trial committee or the executive board. Gatelee, we find, appointed three members of the local union of the Alliance as a trial committee, and plaintiffs' trials were conducted before this committee. Sections 12, 20, 21 and 23 provide that the trial committee, after hearing all the evidence, shall reduce its findings as to the guilt or innocence of the accused, and its recommendation as to the penalty, to writing and report to the next meeting of the local union. The local, then, without debate, shall vote to approve the report or not to do so; and if it is approved, then the local determines the penalty. The trial committee followed the steps outlined, except that its reports were made to Gatelee, and he and not the local union approved the reports, which found the plaintiffs guilty and recommended expulsion, and it was he who then signed formal "sentences," expelling the plaintiffs from the Alliance. Section 13 of article XXI, which article is entitled "Privileges and Duties of Membership," adds this provision to those upon which the plaintiffs place reliance: "No member of this Alliance shall be expelled . . . unless such member has been accorded a fair trial in the manner set forth in Article XVI of this Constitution."

The defendant Alliance does not deny that had plaintiffs' trials been held during normal times, in the life of the local union, the manifest departures from the orthodox trial practice would give the plaintiffs cause for complaint, but it

points out that the trials were not held during normal times, but under conditions which made applicable other provisions of the constitution than those relied upon by the plaintiffs. Particular attention is drawn to the fact that an emergency had been declared to exist in the local union, and it points to sections of its constitution which, it argues, control during an emergency period. In article VII, section 16, it is provided under what circumstances and in what manner an emergency may be found to exist. We must assume, the record being silent on the matter, the plaintiffs having introduced no evidence whatever to the contrary, that the state of emergency under which the Alliance was undoubtedly acting during the period of plaintiffs' trials had been justifiably and regularly determined to exist.

We find it provided in section 16, article VII of the constitution of the Alliance: "b. Where reliable and creditable information is brought to the knowledge of the International President indicating that a condition exists in an affiliated local union whereby the actions of the officers or members thereof endanger the property rights or interests of this Alliance, of any affiliated local union thereof, or of individual members thereof and where, because of the imminence or irreparable injury thereto, the ordinary procedure prescribed by this Constitution and By-Laws would, in the opinion of the International President, prove too slow, cumbersome, and inadequate to completely protect the rights and interests so endangered; then the International President has the right and is hereby empowered, with the consent of the General Executive Board, to declare the existence of a state of emergency in the said local union . . . the International President or his duly accredited representative shall have the power during the continuance of said emergency to take over all books, records, monies, credits, and property of such union of every nature whatsoever and to administer the same according to his best judgment for the benefit of such local and this International; to collect dues, fines and other revenue to which said local may be entitled and to incur and pay all just bills and obligations of said local union out of its funds in his hands; to adjust disputes between employers and members of such local union and enter into working contracts for its members which said contracts shall be valid, legal and binding upon said union and the members thereof after the expiration of said emergency until the expiration thereof; and in general, to conduct the affairs of said union in the same manner as it

might have conducted its own affairs in the absence of such emergency. . . .

"During the continuance of such emergency, all of the rights, powers, and privileges granted to any local union, its officers or members, to conduct its affairs, granted or guaranteed to said local union by its charter, or by this Constitution or any By-Laws enacted hereunder, shall be suspended and any other provisions of this Constitution or the By-Laws enacted hereunder and any provision of the Charter, Constitution or By-Laws of any such local union inconsistent with the powers herein granted to the Executive Board of this Alliance, the International President, Vice-President or International Representative appointed to conduct the affairs of such local union are hereby declared to be entirely inoperative and of no force and effect during the continuance of such emergency and until such emergency shall have terminated and such termination shall have been expressed by resolution of the General Executive Board.

"The sole authority for the conduct of the affairs of such local union during such emergency shall be the orders, rules, mandates, and decisions of the International President, the Executive Board and the Vice-President or International Representative appointed to conduct the affairs of said local union, provided, however, that any officer or member of such union in good standing shall have the right to appeal from any such order, mandate or decision on account of which he feels aggrieved, to the General Executive Board and from the decision of said Board to the delegates of this Alliance when assembled in convention as provided in the Constitution in case of appeals from decisions of the President."

Some other provisions of this constitution should be known. By section 3 of article XII the international president of the Alliance is given power to appoint "one or more International Representatives as the occasion shall arise to represent him in any capacity and for any purpose in which he himself could act." Earlier, in section 13 of article VII, the International President is authorized "to delegate any of his powers . . . to the International Representatives by him appointed. . . ." Mr. Gatelee, whose name was mentioned in our statement of plaintiffs' theory of the case, appears on the scene as such an international representative.

Plaintiffs, of course, recognize the existence of section 16 of article VII, with its provisions which govern in the event of an emergency, and as we have noted they do not combat

the fact that there was a period of emergency reigning during the period when the charges were filed against them and they were tried and expelled from the Alliance. They point, however, to the provision of section 4 of article II of the constitution which was their contract with the Alliance, that gives each local union "full and complete control over its own membership and affairs," and argue that all that section 16 of article VII does, during an emergency, is to deprive a local of control over its *affairs,* leaving it in control of its *membership,* and as a consequence the provisions of article XVI, which govern trials, still govern though an emergency exists.

Without characterizing plaintiffs' construction of the several provisions of the constitution as unreasonable, we decline to accept it because we are of the opinion that the interpretation adopted by the voluntary association, whose actions we are asked to undo, is the more reasonable. An analysis of the terms of the sections, which we have quoted, in support of our statement, seems to us a superfluous act. Plainly, all of the officers of the local union, during an emergency, are supplanted by the international representative appointed to take charge of the local, so that the various steps which they are to take cannot be done by them. If the emergency in a local is caused, as appears to have been the case here, by action participated in by a large number of the members of the local, it would be a futile interpretation which excluded from the affairs, which are taken over by the parent organization, the discipline of the members whose disloyalty is causing the emergency. By provisions of the constitution to which we have not heretofore referred, and concerning which it is not necessary that we do more than make reference, safeguards against the arbitrary and groundless establishment of a period of emergency are set up, as public policy requires (*Supreme Lodge of the World* v. *Los Angeles Lodge No. 386,* (1917) 177 Cal. 132, 136 [169 P. 1040]). When questioned, as was not done in these cases on appeal, the steps by which an emergency is determined to exist should be critically examined because of the great power over local unions that is then placed in the hands of the chief executive of the international union. But granted the state of emergency in a local union, power is properly lodged where it will prove effective and that, the constitution

provides, is in the hands of the international president and his representative.

So far as could safely be done, from the viewpoint of one charged with protecting the interests of the Alliance, plaintiffs' trials followed the regular course provided for them. Gatelee, of course, during the emergency, held all the offices temporarily vacated during the suspension of their regular occupants, so that it was in conformity with section 6 of article XVI that the charges were filed with him instead of the regular secretary of the local. ■ The charges were not read at a meeting of the local, as provided by section 8, article XVI, but the section forbids any debate or discussion following the reading, and the principal purpose of the reading seems to be to enable the prosecution to secure the names of witnesses. In any event we deem the failure to comply with section 8 to have worked no prejudice to plaintiffs. ". . . associations of the kind here involved are not bound to use the strict regularity of legal proceedings, and in reviewing the proceedings taken by such organization relating to the enforcement of its disciplinary laws, the courts will disregard technicalities and not interfere because of a departure from form unless it appears that the accused has been denied a full opportunity to defend himself and the organization has not exercised its powers fairly and in good faith. [Citing cases.]" (*McConville* v. *Milk W. D. Union*, (1930) 106 Cal.App. 696, 701 [289 P. 852].) ■ Gatelee, the only acting officer, was the proper one to appoint the trial committee. ■ Neither he nor the members of the trial committee were revealed to have had any animus toward the plaintiffs before they heard the evidence, and the evidence produced at the trials amply sustained the charges. Because the proof of the plaintiffs' guilt was complete and unchallenged, they can hardly complain to a court of equity that the trial committee's report received the approval of Gatelee without being presented to a meeting of the local. (*Neto* v. *Conselho Amor Da Sociedade, supra,* 18 Cal.App. 234, 239 [122 P. 973]; *Kramer* v. *Slovenian Ladies Society,* (1936) 14 Cal.App.2d 384 [58 P.2d 176].) This leaves only one irregularity which can be said to have substance, and of course it does. While the members of the local could not honestly have done other than confirm the conviction, they could, within an honest exercise of the discretion ordinarily to be exercised by them, have determined that punishment to be imposed upon the

plaintiffs should have been a fine instead of expulsion. It is because at this stage of the proceedings Gatelee used his judgment instead of submitting the problem to the local that we have found it necessary to determine whether or not he had that right. As already stated, it is our conclusion that the interpretation adopted by the officers and executive board of the Alliance, and approved by the trial court, that he had the right, is a reasonable one, and we decline to substitute a different interpretation.

██ The Alliance relies not only upon the provisions of its constitution already referred to, in support of its dismissal of the plaintiffs, but calls attention also to section 5 of article VII, dealing with the judicial power of the international president, and so of his representative. So far as it touches upon the facts of this case the section provides: "The International President shall have original jurisdiction to try charges against individual members of this Alliance:

"a. When charges have been preferred against a member to his local union and the local union has wrongfully neglected or refused to take cognizance of them; or

"b. When charges are preferred against a member of a dissolved or suspended local union." It would not be an unreasonable interpretation to say that during the emergency, the local, whose officers and powers had been suspended, was itself suspended, within the meaning of this section. However, we can accept plaintiffs' construction, which is that section 5 of article VII refers to a suspension of a local in a manner not covered by section 16, article VII, without disturbing the conclusion we have heretofore expressed. Section 5, by plaintiffs' interpretation, would make provision for disciplinary action at a time when the local would not, or because its powers were formally suspended, it could not, discipline its members, but would not cover the situation existing during an emergency. ██ The rule, *expressio unius, exclusio alterius,* "is frequently a helpful rule; but it is always to be subordinated to the primary rule that the intent shall prevail over the letter" (*Gallagher* v. *Campodonico,* (1931) 121 Cal.App.Supp. 765, 774 [5 P.2d 486]; and see *Sobey* v. *Molony,* (1940) 40 Cal.App.2d 381, 389 [104 P.2d 868]). If section 5 of article VII itself does not authorize the international president to try a member during an emergency, it is not to be interpreted as denying him that

right under the terms of section 16, of the same article, whereby he is given very extensive powers when an emergency has arisen. Membership in the Alliance is, generally speaking, gained through and dependent upon membership in a local. We are of the opinion that its constitution makes provision for a method of disciplining local members adequate to the various conditions which may prevail.

The judgment appealed from is affirmed.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied October 21, 1943, and appellants' petition for a hearing by the Supreme Court was denied November 29, 1943.